UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/16/21
```

United States of America,

—v—

Ghislaine Maxwell,

Defendant.

20-cr-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

In June 2020, a grand jury returned a six-count indictment charging Ghislaine Maxwell with facilitating the late financier Jeffrey Epstein's sexual abuse of minor victims from around 1994 to 1997. The Government filed a first (S1) superseding indictment shortly thereafter, which contained only small, ministerial corrections. The S1 superseding indictment included two counts of enticement or transportation of minors to engage in illegal sex acts in violation of the Mann Act and two counts of conspiracy to commit those offenses. It also included two counts of perjury in connection with Maxwell's testimony in a civil deposition. Trial is set to begin on July 12, 2021.

Maxwell filed twelve pretrial motions seeking to dismiss portions of the S1 superseding indictment, suppress evidence, and compel discovery. After the parties fully briefed those motions, a grand jury returned a second (S2) superseding indictment adding a sex trafficking count and another related conspiracy count.

This Opinion resolves all of Maxwell's currently pending pretrial motions other than those seeking to suppress evidence, which the Court will resolve in due course. The motions, and this Opinion, deal exclusively with the S1 superseding indictment and do not resolve any issues

related to the newly added sex trafficking charges.  For the reasons that follow, the Court denies

Maxwell's motions to dismiss the S1 superseding indictment in whole or in part.  It grants her

motion to sever the perjury charges for a separate trial.  It denies her motion to further expedite

discovery.

The Court provides a brief summary of its conclusions here and its reasoning on the

pages that follow:

- Maxwell moves to dismiss all counts based on a non-prosecution agreement between Jeffrey Epstein and the U.S. Attorney for the Southern District of Florida.  The Court concludes that the agreement does not apply in this District or to the charged offenses.

- Maxwell moves to dismiss all counts as untimely.  The Court concludes that the Government brought the charges within the statute of limitations and did not unfairly delay in bringing them.

- Maxwell moves to dismiss the Mann Act counts because they are too vague, or in the alternative to require the Government to describe the charges in greater detail.  The Court concludes that the charges are specific enough.

- Maxwell moves to dismiss the perjury counts because, in her view, her testimony responded to ambiguous questioning and was not material.  The Court concludes that these issues are best left for the jury.

- Maxwell moves to sever the perjury counts from the Mann Act counts so that they can proceed in a separate trial.  The Court concludes that severance is appropriate and will try the perjury counts separately.

- Maxwell moves to strike language from the indictment that she believes is superfluous and to dismiss conspiracy counts she believes are redundant.  The Court concludes that these motions are premature before trial.

- Maxwell moves to compel the Government to immediately disclose certain categories of evidence.  The Court concludes that she is not entitled to do so, but the Court will order Maxwell and the Government to confer on a discovery schedule.

- Maxwell moves to dismiss all counts because a grand jury in White Plains, rather than Manhattan, returned the S1 superseding indictment.  Because a jury in Manhattan returned the S2 superseding indictment, the motion appears moot.

I.      **Jeffrey Epstein's non-prosecution agreement does not bar this prosecution**

In September 2007, under investigation by both federal and state authorities, Jeffrey Epstein entered into a non-prosecution agreement ("NPA") with the Office of the United States Attorney for the Southern District of Florida. Dkt. No. 142 at 1-2.  Epstein agreed in the NPA to plead guilty in Florida state court to soliciting minors for prostitution and to serve eighteen months in a county jail.  *Id.*  In exchange, the U.S. Attorney's Office agreed not to charge him with federal crimes in the Southern District of Florida stemming from its investigation of his conduct between 2001 and 2007.  *Id.* It also agreed not to bring criminal charges against any of his "potential co-conspirators."  *Id.*

As a recent report from the Department of Justice's Office of Professional Responsibility observed, the NPA was unusual in many respects, including its breadth, leniency, and secrecy. OPR Report, Gov. Ex. 3, Dkt. No. 204-3, at x, 80, 175, 179, 260–61.  The U.S. Attorney's promise not to prosecute unidentified co-conspirators marks a stark departure from normal practice for federal plea agreements.  This provision appears to have been added "with little discussion or consideration by the prosecutors."  *Id.* at 169, 185.  The report concluded that the U.S. Attorney's negotiation and approval of the NPA did not amount to professional misconduct, but nonetheless reflected "poor judgment."  *Id.* at 169.

Only the NPA's effect, and not its wisdom, is presently before the Court.  Maxwell contends that the NPA bars this prosecution, because she is charged as a co-conspirator of Jeffrey Epstein and the NPA's co-conspirator provision lacks any geographical or temporal limitations.  The Court disagrees for two independent reasons.  First, under controlling Second Circuit precedent, the NPA does not bind the U.S. Attorney for the Southern District of New York.  Second, it does not cover the offenses charged in the S1 superseding indictment.

### A. The non-prosecution agreement does not bind the U.S. Attorney for the Southern District of New York

United States Attorneys speak for the United States. When a U.S. Attorney makes a promise as part of a plea bargain, both contract principles and due process require the federal government to fulfill it. *See Santobello v. New York*, 404 U.S. 257, 262 (1971); *United States v. Ready*, 82 F.3d 551, 558 (2d Cir. 1996). The question here is not whether the U.S. Attorney for the Southern District of Florida had the power to bind the U.S. Attorney for the Southern District of New York. The question is whether the terms of the NPA did so. Applying Second Circuit precedent and principles of contract interpretation, the Court concludes that they did not.

In *United States v. Annabi*, the Second Circuit held: "A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." 771 F.2d 670, 672 (2d Cir. 1985) (per curiam). This is something akin to a clear statement rule. Single-district plea agreements are the norm. Nationwide, unlimited agreements are the rare exception. Applying *Annabi,* panels of the Second Circuit have stated that courts cannot infer intent to depart from this ordinary practice from an agreement's use of phrases like "the government" or "the United States." *United States v. Salameh*, 152 F.3d 88, 120 (2d Cir. 1998) (per curiam); *United States v. Gonzalez*, 93 F. App'x 268, 270 (2d Cir. 2004). Those are common shorthand. A plea agreement need not painstakingly spell out "the Office of the United States Attorney for Such-and-Such District" in every instance to make clear that it applies only in the district where signed.

Maxwell asks this Court to draw the opposite conclusion. The provision of the NPA dealing with co-conspirators does not expressly state that it binds U.S. Attorneys in other districts. It does not expressly state that it applies in other districts. The relevant language, in

its entirety, reads as follows: "the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein." Dkt. No. 142-1 at 5.  Under *Annabi, Salameh, and Gonzalez*, a statement that "the United States" agrees not to prosecute implies no restriction on prosecutions in other districts.

Two provisions of the NPA refer specifically to prosecution in the Southern District of Florida.  The first states that the U.S. Attorney for the Southern District of Florida will defer "prosecution in this District" if Epstein complies with the agreement.  Dkt. No. 142-1 at 2.  The second states that no prosecution "will be instituted in this District, and the charges against Epstein if any, will be dismissed" after he fulfills the agreement's conditions.  Maxwell contends that the lack of similar language in the co-conspirator provision must mean that it lacks any geographical limitation.  If anything, that language reflects that the NPA's scope was expressly limited to the Southern District of Florida.  It is not plausible—let alone "affirmatively apparent", *Annabi*, 771 F.2d at 672,—that the parties intended to drastically expand the agreement's geographic scope in the single sentence on the prosecution of co-conspirators without clearly so saying.

Without an  affirmative statement in the NPA's text, Maxwell turns to its negotiation history.  Under Second Circuit precedent she may offer evidence that negotiations of the NPA between the defendant and the prosecutors included a promise to bind other districts.  *See United States v. Russo*, 801 F.2d 624, 626 (2d Cir. 1986).  She alleges that officials in the U.S. Attorney's Office for the Southern District of Florida sought and obtained approval for the NPA from the Office of the Deputy Attorney General and communicated with attorneys in other districts.  Any involvement of attorneys outside the Southern District of Florida appears to have been minimal.  Maxwell has already received access to an unusually large amount of information

about the NPA's negotiation history in the form of the OPR report and yet identifies no evidence that the Department of Justice made any promises not contained in the NPA. The OPR report reflects that the Office of the Deputy Attorney General reviewed the NPA, but only after it was signed when Epstein tried to get out of it. OPR Report at 103. Other documents show that attorneys in the Southern District of Florida reached out to other districts for investigatory assistance but not for help negotiating the NPA. Dkt. No. 204-2. Nor would direct approval of the NPA by the Office of the Deputy Attorney General change the meaning of its terms. No evidence suggests anyone promised Epstein that the NPA would bar the prosecution of his co-conspirators in other districts. Absent such a promise, it does not matter who did or did not approve it.

Second Circuit precedent creates a strong presumption that a plea agreement binds only the U.S. Attorney's office for the district where it was signed. Maxwell identifies nothing in the NPA's text or negotiation history to disturb this presumption. The Court thus concludes that the NPA does not bind the U.S. Attorney for the Southern District of New York.

### B. The non-prosecution agreement does not cover the charged offenses

The NPA would provide Maxwell no defense to the charges in the S1 superseding indictment even against an office bound to follow it. The NPA bars prosecution, following Epstein's fulfillment of its conditions, only for three specific categories of offenses:

(1) "the offenses set out on pages 1 and 2" of the NPA; namely, "any offenses that may have been committed by Epstein against the United States from in or around 2001 through in or around September 2007" including five enumerated offenses;

(2) "any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office"; and

(3) "any offenses that arose from the Federal Grand Jury investigation."

Dkt. No. 142-1 at 2. The NPA makes clear that the covered charges are those relating to and deriving from a specific investigation of conduct that occurred between 2001 and 2007.

Maxwell contends that the NPA's co-conspirator provision lacks any limitation on the offenses covered. The Court disagrees with this improbable interpretation. The phrase "potential co-conspirator" means nothing without answering the question "co-conspirator in what?" The most natural reading of the co-conspirator provision is that it covers those who conspired with Epstein in the offenses covered by the NPA for their involvement in those offenses. Thus, it would cover any involvement of Maxwell in offenses committed by Epstein from 2001 to 2007, other offenses that were the subject of the FBI and U.S. Attorney's Office investigation, and any offenses that arose from the related grand jury investigation.

The Court has no trouble concluding that the perjury counts are not covered by the NPA. Those charges do not relate to conduct in which Maxwell conspired with Epstein and stem from depositions in 2016, more than eight years after Epstein signed the NPA. Maxwell now concedes as much, though her motion sought to dismiss the S1 superseding indictment in its entirety, perjury counts and all.

The Mann Act counts, too, fall comfortably outside the NPA's scope. The S1 superseding indictment charges conduct occurring exclusively between 1994 and 1997, some four years before the period covered by the Southern District of Florida investigation and the NPA. The NPA does not purport to immunize Epstein from liability for crimes committed before the period that was the subject of the FBI and U.S. Attorney's Office investigation. Maxwell's protection is no broader. The Court thus concludes that the NPA does not cover the offenses charged in the S1 superseding indictment.

### C. Maxwell is not entitled to an evidentiary hearing

In the alternative to dismissing the indictment, Maxwell requests that the Court conduct an evidentiary hearing as to the parties' intent in the NPA. The Court finds no basis to do so.

The cases Maxwell cites where courts held hearings on the scope of a plea agreement mostly involved oral agreements where there was no written record of the full set of terms reached by the parties. All of them involved defendants with first-hand knowledge of negotiations who claimed prosecutors breached an oral promise. "An oral agreement greatly increases the potential for disputes such as . . . a failure to agree on the existence, let alone the terms, of the deal." *United States v. Aleman*, 286 F.3d 86, 90 (2d Cir. 2002). Thus, an evidentiary hearing may be necessary to determine the terms of an agreement never committed to writing. This is no such case. The NPA's terms are clear. Beyond the NPA itself, an extensive OPR report details its negotiation history. No record evidence suggests that prosecutors promised Epstein anything beyond what was spelled out in writing. The Court agrees with the Government that Maxwell's request for a hearing rests on mere conjecture.

For the same reason, the Court will not order the discovery on the NPA. In any case, it appears that the Government has already produced two of the documents Maxwell seeks in her motion—the OPR report and notes mentioned in a privilege log. Of course, the Government's disclosure obligations would require it to disclose to Maxwell any exculpatory evidence or evidence material to preparing the defense, including any evidence supporting a defense under the NPA. The Government shall confirm in writing within one week whether it views any evidence supporting Maxwell's interpretation of the NPA as material it is required to disclose, and, if so, whether it has disclosed any and all such evidence in its possession.

**II.    The indictment is timely**

### A.  The indictment complies with the statute of limitations

Federal law imposes a five-year limitations period for most non-capital offenses.  18 U.S.C. § 3282(a).  Recognizing the difficulty of promptly prosecuting crimes against children, Congress has provided a longer limitations period for "offense[s] involving the sexual or physical abuse, or kidnaping" of a minor.  18 U.S.C. § 3283.  Until 2003, the operative version of § 3283 allowed prosecution of these offenses until the victim reached the age of twenty-five.  Congress further extended the limitations period in the PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650, to allow prosecution any time during the life of the victim.

The parties agree that the Mann Act charges are timely if subject to the PROTECT Act, but untimely under the general statute of limitations for non-capital offenses or the pre-2003 version of § 3283.  Maxwell contends that the charged offenses do not qualify as offenses involving the sexual or physical abuse or kidnapping of a minor and are thus governed by the general statute of limitations.  Alternatively, she contends that the pre-2003 version of § 3283 applies because the charged conduct occurred prior to 2003.  The Court concludes that statute of limitations in the PROTECT Act applies and that the charges are timely.

#### 1.  The Mann Act charges are offenses involving the sexual abuse of minors

Maxwell does not dispute that the facts alleged in the S1 superseding indictment involve the sexual abuse of minors.  The indictment charges that Epstein sexually abused each of the alleged minor victims and that Maxwell allegedly enticed them to travel or transported them for that purpose.  Instead, Maxwell contends that charged offenses do not qualify as offenses involving the sexual abuse of minors because sexual abuse is not an essential ingredient of each statutory offense.  *See Bridges v. United States*, 346 U.S. 209, 221 (1953).  In Maxwell's view,

for example, it is possible to transport a minor with intent to engage in criminal sexual activity and not follow through with the planned sexual abuse, and so sexual abuse is not an essential ingredient of the offense.  Maxwell makes the same argument for the enticement and related conspiracy charges.

This approach is analogous to the "categorical approach" employed by courts to evaluate prior convictions for immigration and sentencing purposes.  *See Taylor v. United States*, 495 U.S. 575, 602 (1990).  Generally speaking, the "categorical approach" requires that courts "look only to the statutory definitions—i.e., the elements" of the relevant offense to determine if the provision applies "and not to the particular facts underlying those convictions."  *Descamps v. United States*, 570 U.S. 254, 261 (2013) (internal quotation marks omitted).  Whether a statute requires a categorical or case-specific approach is a question of statutory interpretation.  To determine whether Congress used the word "offense" in a statute to refer to an offense in the abstract or to the facts of each individual case, the Court must examine the statute's "text, context, and history."  *United States v. Davis*, 139 S. Ct. 2319, 2327 (2019).

Though it has not authoritatively settled the question, the Second Circuit has strongly suggested that Maxwell's approach is the wrong one.  In *Weingarten v. United States*, 865 F.3d 48, 58–60 (2d Cir. 2017), the Second Circuit discussed at length how the text, context, and history of § 3283 show that Congress intended courts to apply the statute using a case-specific approach.  The Third Circuit reached the same conclusion in *United States v. Schneider*, 801 F.3d 186, 196 (3d Cir. 2015).

The Court sees no reason to depart from the reasoning in *Weingarten*.  First, "[t]he Supreme Court's modern categorical approach jurisprudence is confined to the post-conviction contexts of criminal sentencing and immigration deportation cases." *Weingarten*, 865 F.3d at 58.

To the extent that the categorical approach is ever appropriate in other contexts, it is inappropriate here.

The Court begins with the statute's text.  Statutes that call for application of the categorical approach typically deal with the elements of an offense in a prior criminal conviction. *Id.* at 59.  "The language of § 3283, by contrast, reaches beyond the offense and its legal elements to the conduct 'involv[ed]' in the offense.  That linguistic expansion indicates Congress intended courts to look beyond the bare legal charges in deciding whether § 3283 applied."  *Id.* at 59–60 (alteration in original) (quoting § 3283).  Maxwell cites one case holding otherwise, but that case involved a venue statute presenting significantly different concerns.  *See United States v. Morgan*, 393 F.3d 192, 200 (D.C. Cir. 2004).  The Supreme Court has likewise held that a statute which uses the language "an *offense that . . . involves* fraud or deceit in which the loss to the victim or victims exceeds $10,000" is "consistent with a circumstance-specific approach." *Nijhawan v. Holder*, 557 U.S. 29, 32, 38 (2009) (emphasis added).  Thus, the word "involves" generally means that courts should look to the circumstances of an offense as committed in each case.  This reading accords with a robust legislative history indicating that Congress intended to apply § 3283 to a wide range of crimes against children.  *See Weingarten*, 865 F.3d at 60; *Schneider*, 801 F.3d at 196.

The purposes underlying the categorical approach do not apply here either.  For statutes dealing with prior convictions, "[t]he categorical approach serves 'practical' purposes: It promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."  *Moncrieffe v. Holder*, 569 U.S. 184, 200–01 (2013). In the context of § 3283, there is no prior conviction to assess, and the jury will determine in the first instance whether "the defendant engaged in the applicable abusive conduct."  *Weingarten*,

11

865 F.3d at 60. Maxwell nonetheless contends that using a case-specific approach for § 3283 would be impractical because the Government would need to prove conduct beyond the elements of the offense. It may be true that this approach requires the Government to prove some additional facts, but any statute-of-limitations defense presents factual issues (including, at least, when the alleged conduct took place). This is not a serious practical problem and does not justify setting aside the statute's language and apparent purpose.

Maxwell relies primarily on *Bridges v. United States,* 346 U.S. 209 (1953), to urge this Court to cast *Weingarten* aside. The Supreme Court in *Bridges* addressed a statute that extended the limitations period for defrauding the United States during the Second World War. In that case, the Supreme Court first concluded that making false statements at an immigration hearing was not subject to the extended limitations period because it lacked any pecuniary element as required by the statute. *Id.* at 221. Then, as an alternative basis for its holding, it explained that the offense did not require fraud as an "essential ingredient." *Id.* at 222. It reached that conclusion in large part because the statute's legislative history made clear that Congress intended it to apply only to a narrow class of war frauds causing pecuniary loss. *Id.* at 216.

As the Second Circuit explained in *Weingarten*, Congress had the opposite intent in the enacting in the PROTECT Act. *Weingarten*, 865 F.3d at 59 & n. 10. "In passing recent statutes related to child sex abuse, including extensions of the § 3283 limitations period, Congress 'evinced a general intention to "'cast a wide net to ensnare as many offenses against children as possible.'"" *Id.* at 60 (quoting *Schneider*, 801 F.3d at 196 (quoting *United States v. Dodge*, 597 F.3d 1347, 1355 (11th Cir. 2010) (en banc))). The primary basis for *Bridges*' holding— legislative history supporting a narrow interpretation—does not exist here. Instead, both the statute's plan meaning and its legislative history suggest it should apply more broadly.

12

Based on the statute's text, context, and history, the Court follows *Weingarten* and concludes that the appropriate inquiry is whether the charged offenses involved the sexual abuse of a minor on the facts alleged in this case. There is no question that they did. The Court thus concludes that § 3283 governs the limitations period for the charges here.

### 2.  The 2003 amendment to the statute of limitations applies to these offenses

Maxwell next contends that because the charged conduct took place before the PROTECT Act's enactment, that statute did not lengthen the statute of limitations applicable to her alleged offenses. Here too, the Second Circuit has provided guidance in its decision in *Weingarten*. Although the court did not provide a definitive answer there, it explained that the view Maxwell now takes conflicts with established principles of retroactivity and the decisions of at least two other circuit courts. *Weingarten*, 865 F.3d at 58 & n.8; *see Cruz v. Maypa*, 773 F.3d 138, 145 (4th Cir. 2014); *United States v. Leo Sure Chief*, 438 F.3d 920, 924 (9th Cir. 2006).

The Supreme Court has set out a two-step framework to determine whether a federal statute applies to past conduct. *See Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994). Courts look first to the language of the statute. If the statute states that it applies to past conduct, courts must so apply it. *Weingarten*, 865 F.3d at 54. Otherwise, the statute applies to past conduct unless doing so would create impermissible retroactive effects. *Id.*

The Court begins with *Landgraf*'s first step. To assess a statute's meaning here, courts must consider the text of the statute along with other indicia of congressional intent, including the statute's history and structure. *See Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*, 391 F.3d 401, 406 (2d Cir. 2004).

13

Section 3283, as amended by the PROTECT Act, broadly states that "[n]o statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall preclude such prosecution during the life of the child."  The statute lacks an express retroactivity clause, but courts have held that no such clause is necessary, including for this particular statute.  *See Leo Sure Chief*, 438 F.3d at 923.  The statute's plain language unambiguously requires that it apply to prosecutions for offenses committed before the date of enactment.  Instead of simply providing a new limitations period for future conduct, Congress stated that *no* statute of limitations that *would otherwise preclude* prosecution of these offenses will apply.  That is, it prevents the application of any statute of limitations that would otherwise apply to past conduct.

Courts have reached the same conclusion for other statutes employing similar language. The Eighth Circuit has held that the 1994 amendments to § 3283, which allowed prosecution of sex crimes against children until the victim reached age twenty-five, applied to past conduct.  *See United States v. Jeffries*, 405 F.3d 682, 684–85 (8th Cir. 2005).  The Second Circuit has observed that the Higher Education Technical Amendments of 1991, Pub. L. No. 102-26, 105 Stat. 123, illustrates language that requires a statute's application to past conduct.  *See Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*, 391 F.3d at 407.  That statute eliminated the statute of limitations for claims on defaulted student loans by stating that "no limitation shall terminate the period within which suit may be filed."  *Id.*  The PROTECT Act's language is quite similar.

The history of § 3283 confirms Congress's intent to apply the extended limitations period as broadly as the Constitution allows.  With each successive amendment to the statute, Congress further extended the limitations period, recognizing that sex crimes against children "may be difficult to detect quickly" because children often delay or decline to report sexual abuse.

*Weingarten*, 865 F.3d at 54.  Congress enacted the limitations provision of the PROTECT Act because it found the prior statute of limitations was "inadequate in many cases."  H.R. Conf. Rep. No. 108-63, at 54 (2003).  For example, a person who abducted and raped a child could not be prosecuted beyond this extended limit—even if DNA matching conclusively identified him as the perpetrator one day after the victim turned 25."  *Id.*

Maxwell makes no argument based on the statute's text.  Instead, she contends that because the House version of the bill included an express retroactivity provision absent from its final form, the Court should infer that Congress did not intend the statute to apply to past conduct.  However, the legislative history makes clear that Congress abandoned the retroactivity provision in the House bill only because it would have produced unconstitutional results.  The Supreme Court has explained that a law that revives a time-barred prosecution violates the Ex Post Facto Clause of the Constitution, but a law that extends an un-expired statute of limitations does not.  *Stogner v. California*, 539 U.S. 607, 632–33 (2003).  Senator Leahy, who co-sponsored the PROTECT Act, expressed concerns in a committee report that the proposed retroactivity provision was "of doubtful constitutionality" because it "would have revived the government's authority to prosecute crimes that were previously time-barred."  149 Cong. Rec. S5137, S5147 (Apr. 10, 2003) (statement of Sen. Leahy).  Congress removed the provision shortly thereafter for this reason.  The removal of the express retroactivity provision shows only that Congress intended to limit the PROTECT Act to its constitutional applications, including past conduct—like Maxwell's—on which the statute of limitations had not yet expired.

Both the text and history of the PROTECT Act's amendment to § 3283 reflect that it applies Maxwell's conduct charged in the S1 superseding indictment.  The Court could stop here.

However, it also concludes that even if the statute were ambiguous, it would properly apply to these charges.

At *Lanfgraf*'s second step, the Court asks whether application of the statute to past conduct would have impermissible retroactive effects. "[A] statute has presumptively impermissible retroactive effects when it 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.'" *Weingarten*, 865 F.3d at 56 (quoting *Landgraf*, 511 U.S. at 290). Thus, applying a new statute of limitations to previously time-barred claims has an impermissible retroactive effect. *Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*, 391 F.3d at 407. Applying it to conduct for which the statute of limitations has not yet expired does not. *Vernon v. Cassadaga Valley Cent. Sch. Dist.*, 49 F.3d 886, 890 (2d Cir. 1995).

Maxwell concedes that these offenses were within the statute of limitations when Congress enacted the PROTECT Act. Thus, the Act did not deprive her of any vested rights. Maxwell contends that it is unfair to allow the Government to prosecute her now for conduct that occurred more than twenty years ago, but there is no dispute that Congress has the power to set a lengthy limitations period or no limitations period at all. It has done so here, judging that the difficulty of prosecuting these offenses and the harm they work on children outweighs a defendant's interest in repose. Maxwell's fairness argument is a gripe with Congress's policy judgment, not an impermissibly retroactive application of the statute. The Court concludes that § 3283 allows her prosecution now.

### B. The Government's delay in bringing charges did not violate due process

"As the Supreme Court stated in *United States v. Marion*, the statute of limitations is 'the primary guarantee against bringing overly stale criminal charges.'" *United States v. Corniele*,

16

171 F.3d 748, 751 (2d Cir. 1999) (cleaned up) (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)). There is a strong presumption that an indictment filed within the statute of limitations is valid. To prevail on a claim that pre-indictment delay violates due process, a defendant must show both that the Government intentionally delayed bringing charges for an improper purpose and that the delay seriously damaged the defendant's ability defend against the charges. *See id.* This is a stringent standard. "Thus, while the [Supreme] Court may not have shut the door firmly on a contention that at some point the Due Process Clause forecloses prosecution of a claim because it is too old, at most the door is barely ajar." *DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 790–91 (2d Cir. 1999).

The Court sees no evidence that the Government's delay in bringing these charges was designed to thwart Maxwell's ability to prepare a defense. However, it is enough to say that Maxwell does not make the strong showing of prejudice required to support this sort of claim. Maxwell contends that the Government's delay in bringing charges has prejudiced her interests because potential witnesses have died, others have forgotten, and records have been lost or destroyed. It is highly speculative that any of these factors would make a substantial difference in her case.

Maxwell first points to several potential witnesses who have passed away. These include Jeffrey Epstein and his mother, one individual Maxwell believes worked with one of the alleged victims in this case, and a police detective who investigated Epstein in Florida. She contends they all would have provided exculpatory testimony were they alive today. Courts have generally found that vague assertions that a deceased witness might have provided favorable testimony do not justify dismissing an indictment for delay. *See, e.g.*, *United States v. Scala*, 388 F. Supp. 2d 396, 399–400 (S.D.N.Y. 2005). The Court agrees with this approach. Maxwell

provides no indication of what many of these potential witnesses might have testified to. The testimony she suggests the detective might have offered—that witnesses in the Palm Beach investigation did not identify Maxwell by name—is propensity evidence that does nothing to establish her innocence of the charged offenses. There are also serious doubts under all of the relevant circumstances that a jury would have found testimony from Epstein credible even if he had waived his right against self-incrimination and testified on her behalf. *See United States v. Spears*, 159 F.3d 1081, 1085 (7th Cir. 1999).

Maxwell's arguments that the indictment should be dismissed because of the possibility of missing witnesses, failing memories, or lost records fail for similar reasons. These are difficulties that arise in any case where there is extended delay in bringing a prosecution, and they do not justify dismissing an indictment. *United States v. Marion*, 404 U.S. 307, 325–26 (1971); *see United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979).

Finally, the Court finds no substantial prejudice from the pretrial publicity this case has garnered. Maxwell contends that lengthy public interest in this case has transformed her reputation from that of Epstein's friend to a co-conspirator. And she also alleges—without evidence—that her accusers fabricated their stories based on media allegations. The Court will not dismiss the indictment on Maxwell's bare assertion that numerous witnesses are engaged in a perjurious conspiracy against her. And the Court will take all appropriate steps to ensure that the pretrial publicity in this case does not compromise Maxwell's right to a fair and impartial jury.

The Court thus concludes that Maxwell has failed to establish actual prejudice from the Government's delay in bringing charges. She may renew her motion if the factual record at trial shows otherwise. On the present record, neither the applicable statute of limitations nor due process bars the charges here.

**III.     The indictment describes the charged offenses with specificity**

Maxwell seeks to dismiss the Mann Act counts for lack of specificity or in the alternative to compel the Government to submit a bill of particulars providing greater detail of the charges. The Court concludes that the charges in the S1 superseding indictment are clear enough.

Under Federal Rule of Criminal Procedure 7, an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." The indictment must be specific enough to inform the defendant of the charges and allow the defendant to plead double jeopardy in a later prosecution based on the same events. *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). "Under this test, an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States. v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975). In addition to dismissal, "Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

The S1 superseding indictment sets out the elements of each charged crime and the facts supporting each element. Nonetheless, Maxwell contends that the indictment is too vague because it refers to open-ended time periods, describes conduct like "grooming" and "befriending" that is not inherently criminal, and does not identify the alleged victims by name.

Maxwell's first argument fails because the Government need only describe the time and place of charged conduct "in approximate terms." *Tramunti*, 513 F.2d at 1113. The details are subject to proof at trial. "[T]he Second Circuit routinely upholds the 'on or about' language used

19

to describe the window of when a violation occurred." *United States v. Kidd*, 386 F. Supp. 3d 364, 369 (S.D.N.Y. 2019) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987)). "This is especially true in cases of sexual abuse of children: allegations of sexual abuse of underage victims often proceed without specific dates of the offenses." *United States v. Young*, No. 08-cr-285 (KMK), 2008 WL 4178190, at *2 (S.D.N.Y. Sept. 4, 2008) (collecting cases). As here, these cases frequently involve alleged abuse spanning a lengthy period of time, and witnesses who were victimized as children may struggle to recall the precise dates when abuse occurred. The indictment adequately describes the time and place of the charged conduct.

Maxwell next contends that allegations of noncriminal conduct render the charges impermissibly vague. The Court disagrees. Rule 7 requires only that the language of the indictment track the language of the statute and provide a rough account of the time and place of the crime. *Tramunti*, 513 F.2d at 1113. The language of the S1 superseding indictment does so. The Government's decision to provide more details than those strictly required does not hamper Maxwell's ability to prepare a defense. Maxwell's argument that some of the conduct alleged is not inherently criminal goes to the merits of the Government's case, not the specificity of the charges.

Finally, Maxwell argues that the indictment is vague because the government does not provide the names of the alleged victims. The Court sees no basis to require that the alleged victims' names be included the indictment. The names of victims, even if important, generally need not appear there unless their omission would seriously prejudice the defendant. *See United States v. Stringer*, 730 F.3d 120, 127 (2d Cir. 2013); *United States v. Kidd*, 386 F. Supp. 3d 364, 369 (S.D.N.Y. 2019). Maxwell likely knows the identity of the alleged victims described in the indictment at this point because the Government has provided extensive discovery on them.

20

Moreover, the Government has agreed to disclose their names in advance of trial. There is thus no unfairness here. *See Stringer*, 730 F.3d at 126. As discussed below, the Court will require the parties to negotiate and propose a full schedule for all remaining pretrial disclosures.

## IV.    The perjury charges are legally tenable

The Court turns next to Maxwell's motion to dismiss the perjury counts stemming from her answers to questions in a deposition in a civil case. She contends that these charges are legally deficient because the questions posed were fundamentally ambiguous and the questions were not material to the subject of the deposition. The Court concludes that the charges are legally tenable and Maxwell's defenses are appropriately left to the jury.

The applicable perjury statute imposes criminal penalties on anyone who "in any proceeding before or ancillary to any court . . . knowingly makes any false material declaration." 18 U.S.C. § 1623(a). Testimony is perjurious only if it is knowingly false and is material to the proceeding in which the defendant offered it.

### A.   The questions posed were not too ambiguous to support a perjury charge

The requirement of knowing falsity requires that a witness believe that their testimony is false. *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986). As a general matter, "[a] jury is best equipped to determine the meaning that a defendant assigns to a specific question." *Id.* Courts have acknowledged a narrow exception for questions that are so fundamentally ambiguous or imprecise that the answer to them cannot legally be false. *Id.* at 372, 375; *see also United States v. Wolfson*, 437 F.2d 862, 878 (2d Cir. 1970). A question is fundamentally ambiguous only if reasonable people could not agree on its meaning in context. *Lighte*, 782 F.2d at 375. The existence of some arguable ambiguity does not foreclose a perjury charge against a witness who understood the question.

At a minimum, Maxwell's motion is premature.  Courts typically evaluate whether a question was fundamentally ambiguous only after the development of a full factual record at trial.  *See, e.g.*, *United States v. Markiewicz*, 978 F.2d 786, 808 (2d Cir. 1992).  The evidence at trial may shed further light on whether the questions posed were objectively ambiguous in context or whether Maxwell subjectively understood them.  In any event, the Court has closely considered each of the categories of questions that Maxwell argues are ambiguous.  None of the alleged ambiguities Maxwell identifies rise to the level supporting dismissal of the charges. The context of the questions and answers, in conjunction with the Government's evidence, could lead a reasonable juror to conclude that the statements were perjurious.  Truth and falsity are questions for the jury in all but the most extreme cases.  The Court declines to usurp the jury's role on the limited pretrial record.

### B.  A reasonable juror could conclude that Maxwell's statements were material

Maxwell also argues that the perjury counts should be dismissed because none of the allegedly false statements were material to the defamation action.  In a civil deposition, a statement is material if it has a natural tendency to influence the court or if a truthful answer might reasonably lead to the discovery of admissible evidence.  *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *United States v. Kross*, 14 F.3d 751, 753–54 (2d Cir. 1994).  Like knowing falsity, materiality is an element of the offense and thus ordinarily must be "decided by the jury, not the court."  *Johnson v. United States*, 520 U.S. 461, 465 (1997).  Only the most extraordinary circumstances justify departure from this general rule.  *United States v. Forde*, 740 F. Supp. 2d 406, 412 (S.D.N.Y. 2010) (citing *Gaudin*, 515 U.S. at 522–23).

The charged statements do not fall within this narrow exception.  Maxwell contends that the questions did not relate to the sex trafficking and sexual abuse allegations at the center of the

civil case, but that is not the legal standard. The Government may prevail if it proves that

Maxwell's answers could have led to the discovery of other evidence or could influence the

factfinder in the civil case. *See Gaudin*, 515 U.S. at 509; *Kross*, 14 F.3d at 753–54. At trial, a

reasonable juror could conclude that truthful answers to the questions may have permitted the

plaintiff to locate other victims or witnesses who could have corroborated the plaintiff's

testimony. The factual disputes relating to materiality are at least enough to preclude pretrial

resolution. In criminal cases, courts must guard against "invading the 'inviolable function of the

jury' in our criminal justice system," and if the "defense raises a factual dispute that is

inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that

dispute on a Rule 12(b) motion." *United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018).

  The Court concludes that the perjury charges are legally tenable and appropriately

presented to the jury.

## V.   The perjury charges must be severed and tried separately

  Although the perjury charges are legally tenable, the Court concludes that the interests of

justice require severing those counts and trying them separately. Trying the perjury counts

together with the Mann Act counts would require admitting evidence of other acts likely to be

unduly prejudicial. It would also risk disqualifying Maxwell's chosen counsel based on their

involvement in the earlier civil case.

  Rule 14(a) of the Federal Rules of Criminal Procedure allows a court to order separate

trials if joining all offenses in a single trial would prejudice the defendant. A defendant seeking

severance must show significant unfairness to outweigh the burden on the court of conducting

multiple trials. *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998). The harm to the

defendant must be more than "solely the adverse effect of being tried for two crimes rather than

one." *United States v. Werner*, 620 F.2d 922, 929 (2d Cir. 1980).  Though this standard is demanding, the Court concludes that, due to unique features of the perjury counts, Maxwell meets it here.  Trying all counts together would compromise Maxwell's right to the counsel of her choice and risk an unfair trial.

Trying the perjury counts together with the Mann Act counts would risk an unfair trial on each set of counts.  First, it would introduce unrelated allegations of sexual abuse, which would potentially expose the jury to evidence that might otherwise not be admissible.  In particular, a joint trial would potentially expose the jury to a wider swath of information regarding civil litigation against Epstein that is remote from Maxwell's charged conduct.  This presents a significant risk that the jury will cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not do so.  *See United States v. Halper*, 590 F.2d 422, 430 (2d Cir. 1978).  Second, the evidence presented on the Mann Act counts may prejudice the jury's ability to fairly evaluate Maxwell's truthfulness in her deposition, a critical element of the perjury counts.  The Court has concerns that a limiting instruction may be inadequate to mitigate these risks given the nature of the allegations involved.

Importantly, a joint trial is also likely to require disqualification of at least one of Maxwell's attorneys from participating as an advocate on her behalf.  The perjury counts likely implicate the performance and credibility of her lawyers in the civil action—two of whom represent her in this case.  The New York Rules of Professional Conduct generally forbid a lawyer from representing a client in a proceeding in which the lawyer is likely also to be a witness.  N.Y. R. Prof'l Conduct § 3.7(a).  Maxwell's counsel in the civil action and the deposition may be important fact witnesses on the perjury counts.  Even if counsel were not required to testify, trying all counts together could force Maxwell to choose between having her

counsel testify on her behalf on the perjury charges and having them assist her in defending the Mann Act charges.

The Second Circuit has recognized that witness testimony offered by a party's attorney presents serious risks to the fairness of a trial. *See Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009). The lawyer might appear to vouch for their own credibility, jurors might perceive the lawyer as distorting the truth to benefit their client, and blurred lines between argument and evidence might confuse the jury. *Id.* Disqualification of counsel also implicates Maxwell's Sixth Amendment right to be represented by the counsel of her choice. *See, e.g.*, *United States v. Kincade*, No. 15-cr-00071 (JAD) (GWF), 2016 WL 6154901, at *6 (D. Nev. Oct. 21, 2016). The prejudice to Maxwell is especially pronounced because the attorneys who represented her in the civil case have worked with her for years and are particularly familiar with the facts surrounding the criminal prosecution. *See United States v. Cunningham*, 672 F.2d 1064, 1070–71 (2d Cir. 1982).

The Court is of course cognizant of the burden separate trials may impose on all trial participants. But much of the proof relevant to the perjury counts and the Mann Act counts does not overlap. In particular, materiality for statements made in a civil deposition is broad, and evidence on that question is unlikely to bear on the other charges here. *See Kross*, 14 F.3d at 753–54; *Gaudin*, 515 U.S. at 509. Although some allegations of sexual abuse are relevant to both sets of charges, many are not. At a minimum, this will expand the scope of the trial far beyond the narrower issues presented. And while the Court agrees with the Government that at least some of Maxwell's concerns are overstated, there is little question that the jury's consideration of the nature of the defamation action will require a significant investment of time and resources to provide the requisite context.

25

The balance of these considerations favors severance. "Motions to sever are committed to the sound discretion of the trial judge." *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989). In its discretion, the Court concludes that trying the perjury counts separately will best ensure a fair and expeditious resolution of all charges in this case.

## VI.    Maxwell's motion to strike surplusage is premature

Maxwell moves to strike allegations related to one of the alleged victims from the S1 superseding indictment as surplusage. The Court declines to do so at this juncture.

Federal Rule of Criminal Procedure 7(d) allows a court to strike surplusage from an indictment on a defendant's motion. "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (cleaned up). Courts in this District generally delay ruling on any motion to strike until after the presentation of the Government's evidence at trial, because that evidence may affect how specific allegations relate to the overall charges. *See, e.g.*, *United States v. Nejad*, No. 18-cr-224 (AJN), 2019 WL 6702361, at *18 (S.D.N.Y. Dec. 6, 2019); *United States v. Mostafa*, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013).

Maxwell contends that the allegations related to "Minor Victim-3" are surplusage because the indictment does not charge that Minor Victim-3 traveled in interstate commerce or was below the age of consent in England where the alleged activities took place. Thus, she argues, these allegations do not relate to the charged conspiracy and instead reflect an attempt to introduce Minor Victim-3's testimony for impermissible purposes.

The Court will not strike any language from the S1 superseding indictment at this juncture. The standard under Rule 7(d) is "exacting" and requires the defendant to demonstrate

clearly that the allegations are irrelevant to the crimes charged. *United States v. Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982). The indictment does not allege that the alleged victim traveled in interstate commerce or was underage during sexual encounters with Epstein. But the Court cannot rule out that the allegations may reflect conduct undertaken in furtherance of the charged conspiracy or be relevant to prove facts such as Maxwell's state of mind. *See United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). The Court will follow the well-worn path of others in this District and reserve the issue for trial. Maxwell may renew her motion then.

## VII.    Maxwell's motion to dismiss multiplicitous charges is premature

Maxwell's motion to dismiss either the first or third count of the S1 superseding indictment as multiplicitous is also premature. Maxwell contends that the Government has alleged the same conspiracy twice in the indictment. "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). "The multiplicity doctrine is based upon the double jeopardy clause of the Fifth Amendment, which assures that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *United States v. Nakashian*, 820 F.2d 549, 552 (2d Cir. 1987) (cleaned up).

"Where there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006). "Since *Josephberg*, courts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature." *United States v. Medina*, No. 13-cr-272

(PGG), 2014 WL 3057917, at *3 (S.D.N.Y. July 7, 2014) (collecting cases). The Court therefore denies Maxwell's motion to dismiss multiplicitous counts without prejudice.

## VIII. The parties shall negotiate all remaining disclosures

Maxwell moves to compel the Government to produce certain documents she believes it has in its possession and has failed to produce. She also seeks accelerated disclosure of the Government's witness list, Jencks Act material, *Brady* and *Giglio* material, co-conspirator statements, and Rule 404(b) material. Based on the Government's response in briefing and letters the parties have since submitted to the Court, it appears that most of these requests have been overtaken by events. Accordingly, although the Court concludes that Maxwell is not entitled to expedite this discovery based on the arguments in her motion papers, the Court will require the parties to confer on an overall schedule for all remaining pretrial disclosures.

### A. The Court accepts the Government's representations that it has disclosed all *Brady* and *Giglio* Material

The Supreme Court's decisions in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) require the Government to disclose to defendants certain evidence that will aid their defense. *Brady* requires disclosure of exculpatory evidence. Under *Giglio*, the Government has a duty to produce "not only exculpatory material, but also information that could be used to impeach a key government witness." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citing *Giglio*, 405 U.S. at 154). As a general rule, "*Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." *Id.* at 146. "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Id.* at 144.

28

Maxwell requests an order directing immediate disclosure of all *Brady* and *Giglio* material and also requests a few specific documents she contends the Government has failed to disclose.  The Court begins with the specific requests.  The requested materials include (1) records of witness interviews in connection with an ex parte declaration in support of a response to a motion to quash subpoenas; (2) an unredacted copy of two FBI reports; (3) pages from a personal diary that is in the custody of a civilian third party; and (4) copies of all subpoenas the Government has issued for Maxwell's records as part of its investigation in this case.

The Government represents that it is cognizant of its *Brady* obligations, that is has reviewed the witness interviews and one of the FBI reports, and that neither set of documents includes exculpatory information not previously disclosed.  The Court has no reason to doubt the Government's representation in this case that it is aware of its Brady obligations and that it has complied and will continue to comply with them.  And because the witness statements are covered by the Jencks Act, the Court cannot compel production of such statements under the terms of the statute.  *See* 18 U.S.C. § 3500; *Coppa*, 267 F.3d at 145.  Next, the Government represents that it has already produced an unredacted copy of the other requested FBI report, and so that request is moot.  The diary pages she requests are within the control of a civilian third party, not the Government, and so the Government need not (and perhaps cannot) produce them. *See United States v. Collins*, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019).  Finally, Maxwell's request for copies of all subpoenas the Government has issued is overly broad and lacks a legal basis.  Maxwell is not entitled to compel production of these documents.

The Court also will not issue an order requiring the immediate disclosure of *Brady* and *Giglio* material.  The Government has represented that it recognizes its obligations under Brady and that it has complied, and will continue to comply, with such obligations.  The Court has no

reason to doubt these representations given its expansive approach to document production thus far in this case. The Government has agreed in its recent letter to produce *Giglio* material six weeks in advance of trial. The parties shall negotiate the specific timing, but assuming a schedule along those lines is met, the Court concludes that Maxwell will be able to effectively prepare for trial. *See Coppa*, 267 F.3d at 144.

### B. Jencks Act material and co-conspirator statements

Maxwell also seeks to expedite discovery of Jencks Act material and non-exculpatory statements of co-conspirators that the government may offer at trial. The Jencks Act, 18 U.S.C. § 3500, "provides that no prior statement made by a government witness shall be the subject of discovery until that witness has testified on direct examination." *Coppa*, 267 F.3d at 145. The statute therefore prohibits a district court in most cases from ordering the pretrial disclosure of witness statements unless those statements are exculpatory. "A coconspirator who testifies on behalf of the government is a witness under the Act." *In re United States*, 834 F.2d 283, 286 (2d Cir. 1987). The Court therefore lacks the inherent power to expedite these disclosures. In any case, the Government has agreed to produce all Jencks Act material at least six weeks in advance of trial.

The Court also rejects Maxwell's alternative request for a hearing to determine the admissibility of co-conspirator declarations. Co-conspirator statements may often be admitted at trial on a conditional basis. If the Court determines that the Government has not met its burden to show that the conditionally admitted statements were made in furtherance of the charged conspiracy, the Court should provide a limiting instruction or, in extreme cases declare a mistrial. *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993). Although conditional admissions can pose a problem, a pretrial hearing is unnecessary here because the Government

30

has committed to producing co-conspirator statements at least six weeks in advance of trial to allow Maxwell to raise any objections. Maxwell will have adequate time to object to any proffered co-conspirator testimony following the Government's Jencks Act disclosures.

### C. Witness list

As a general matter, "district courts have authority to compel pretrial disclosure of the identity of government witnesses." *United States v. Cannone*, 528 F.2d 296, 300 (2d Cir. 1975). In deciding whether to order accelerated disclosure of a witness list, courts consider whether a defendant has made a specific showing that disclosure is "both material to the preparation of the defense and reasonable in light of the circumstances surrounding the case." *United States v. Bejasa*, 904 F.2d 137, 139–140 (2d Cir. 1990) (cleaned up).

Maxwell has made a particularized showing that the Government must produce a witness list reasonably in advance of trial. The nature of the allegations in this case—decades-old allegations spanning multiple locations—present considerable challenges for the preparation of the defense. However, the Government's proposed disclosure schedule—which will afford Maxwell at least six weeks to investigate testifying witness statements—allows Maxwell significantly more time to review disclosures than schedules adopted in most cases in this District. *See, e.g.*, *United States v. Rueb*, No. 00-CR-91 (RWS), 2001 WL 96177, at *9 (S.D.N.Y. Feb. 5, 2001) (thirty days before trial); *United States v. Nachamie*, 91 F. Supp. 2d 565, 580 (S.D.N.Y. 2000) (fourteen days before trial). In addition, on April 13, 2021, the Government produced over 20,000 pages of interview notes, reports and other materials related to non-testifying witnesses. After considering the circumstances, including the complexity of the issues in this case and what the defense has already received and likely learned in the course of discovery, the Court concludes that the Government's proposal is generally reasonable.

### D.  Rule 404(b) material

Maxwell's final discovery request is for early disclosure of evidence the Government seeks to offer under Federal Rule of Evidence 404(b).  Under Rule 404(b), if the prosecutor in a criminal case intends to use "evidence of a crime, wrong, or other act" against a defendant, the prosecutor must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial" and must "do so in writing before trial—or in any form during trial if the court, for good cause, excuses lack of pretrial notice."  The Government represents that it will notify the defense of its intent to use 404(b) evidence at least 45 days in advance of trial to allow Maxwell to file any motions in limine to be considered at the final pretrial conference.  The Government's proposal will give Maxwell an opportunity to challenge admission of that evidence and to bring to the Court's attention any issues that require resolution before trial.  "This is all that Rule 404(b) requires."  *United States v. Thompson*, No. 13-cr-378 (AJN), 2013 WL 6246489, at \*9 (S.D.N.Y. Dec. 3, 2013).  The Court concludes this schedule is generally reasonable, although additional time to enable briefing and resolution in advance of trial is strongly encouraged.

The Court's denial of Maxwell's requests to compel pretrial disclosures does not preclude the parties from negotiating in good faith for an expedited discovery timeline that will account for Maxwell's specific concerns.  "[I]n most criminal cases, pretrial disclosure will redound to the benefit of all parties, counsel, and the court."  *United States v. Percevault*, 490 F.2d 126, 132 (2d Cir. 1974).  In general, the Court will require the parties to negotiate a final, omnibus schedule to propose to the Court.  The Court concludes that the disclosure of all of the above materials approximately six to eight weeks in advance of trial is appropriate and sufficient.

Given the complexities of the case and the addition of two counts via the S2 indictment, the Court encourages the parties to agree to approximately eight weeks.

**IX.    The S2 superseding indictment moots Maxwell's grand jury challenge**

The Court has not received supplemental briefing on the motions in light of the return of the S2 superseding indictment and so does resolve any such issues here.[1]  However, Maxwell's motion seeking to dismiss the S1 superseding indictment because it was returned by a grand jury sitting at the White Plains courthouse appears moot.  Maxwell argued that the use of a grand jury drawn from the White Plains Division in this District did not represent a fair cross-section of the community, because her trial would proceed in the Manhattan Division.  A grand jury sitting in Manhattan returned the S2 superseding indictment.  By April 21, 2021, Maxwell shall show cause why her grand jury motion should not be dismissed on that basis.

**Conclusion**

The Court DENIES Maxwell's motions to dismiss the indictment as barred by Epstein's non-prosecution agreement (Dkt. No. 141), to dismiss the Mann Act counts as barred by the statute of limitations (Dkt. No. 143), to dismiss the indictment for pre-indictment delay (Dkt. No. 137), to dismiss the Mann Act counts for lack of specificity (Dkt. No. 123), to dismiss the perjury counts as legally untenable (Dkt. No. 135), to strike surplusage (Dkt. No. 145), to dismiss count one or count three as multiplicitous (Dkt. No. 121), and to expedite pretrial disclosures (Dkt. No. 147).  The Court GRANTS Maxwell's motion to sever the perjury counts for a separate trial (Dkt. No. 119).

---

[1] The parties shall negotiate and propose a schedule for any available additional or supplement rulings in light of the filing of the S2 indictment.

33

The Court ORDERS the Government to confirm within one week whether it considers any evidence related to negotiation of the non-prosecution agreement to constitute *Brady* or Rule 16 material and, if so, to confirm that it has or will disclose such evidence.

The Court further ORDERS the parties to negotiate a final schedule for all pretrial disclosures that remain outstanding, including: *Brady*, *Giglio*, and Jenks Act materials, including co-conspirator statements; non-testifying witness statements; testifying witness statements; the identity of victims alleged in the indictment; 404(b) material; and the Government's witness list. The Court also requires the parties to negotiate a schedule for any additional or supplemental motions briefing in light of the S2 indictment. The Court ORDERS a joint proposal to be submitted by April 21, 2021.  If agreement is not reached, the parties shall submit their respective proposals.

The Court further ORDERS Maxwell to show cause by April 21, 2021 why her motion to dismiss the S1 superseding indictment under the Sixth Amendment (Dkt. No. 125) should not be denied as moot.

SO ORDERED.


Dated: April 16, 2021
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

34